**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**JOVAN BLACKMON,**

     **Petitioner,**

**v.**                                  **Case No. 8:17-cv-121-T-35SPF**

**SECRETARY, DEPARTMENT**
**OF CORRECTIONS,**

     **Respondent.**
_____/

## O R D E R

This cause comes before the Court on Jovan Blackmon's timely-filed *pro se* petition for the writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 4) Upon consideration of the petition, the response (Doc. 16) and Blackmon's reply (Doc. 17), and in accordance with the *Rules Governing Section 2254 Cases in the United States District Courts*, the Court **ORDERS** that the petition is **DENIED**:

## PROCEDURAL HISTORY

Blackmon was convicted after a jury trial of first degree felony murder and aggravated child abuse. (Doc. 16-7 Ex. 4) He was sentenced to concurrent terms of life imprisonment for felony murder and 30 years in prison for aggravated child abuse. (Doc. 16-7 Ex. 5) The state appellate court *per curiam* affirmed Blackmon's convictions and sentences. (Doc. 16-7 Ex. 14) Blackmon's first motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 was dismissed. (Doc. 16-7 Exs. 17, 18) The state court denied Blackmon's amended motion. (Doc. 16-8 Exs. 19, 20, 24) The state appellate court *per curiam* affirmed the denial of postconviction relief. (Doc. 16-8 Ex. 29)

# **FACTUAL BACKGROUND; TRIAL TESTIMONY AND ARGUMENT**[1]

**I.    Factual Background**

Blackmon and his girlfriend Sonya Hannor had three children, including 10-month-old Demetrius. On the morning of July 26, 2005, Blackmon, Hannor, and the three children got into the family's van. After dropping Hannor off at work, Blackmon and the children went to the home of Blackmon's sister, Chantrell Walker. Walker's three children were present. Walker's friend Connetia White, along with White's three children, were also at the house. White was sick and napped on and off during the day.

After arriving, Blackmon went upstairs to play video games and left Demetrius downstairs. Later in the morning, Blackmon left to go to an appointment. Demetrius remained at the house. When Blackmon returned, he got something to eat downstairs, but continued to spend most of the time upstairs. In the afternoon, Walker's friend Teramesha Brown came over to the house.

Over the course of the day, the children played in a room downstairs. Demetrius was the youngest child, and the only child who was still crawling. The other children ranged from approximately one to 10 years old. Walker, White, and Brown interacted with Demetrius, and observed that he seemed happy, playful, and alert during the day. None of them had reason to be concerned about Demetrius or saw Blackmon or anyone else hit Demetrius. Connetia White testified, however, that at one point she saw Blackmon holding a belt in his hand and standing over Demetrius. Believing that Blackmon was about to hit Demetrius, White kicked Blackmon in the buttocks and told him to stop.

---

[1] This summary is derived from the trial transcript and appellate briefs.

Blackmon was surprised; he stopped and asked who kicked him but was not angry with White.

At approximately 3:00 p.m., Blackmon drove Connetia White on an errand. They took Demetrius with them in the van. White recalled that Demetrius screamed when he saw Blackmon inside the van. When White asked Blackmon why Demetrius screamed, Blackmon responded that Demetrius just did not like him. Blackmon had made a similar comment to Teramesha Brown about a week prior, stating that Demetrius did not like him and he did not like Demetrius.

After the errand, they picked up Sonya Hannor from work and went back to Blackmon and Hannor's apartment so Hannor could get her laptop for her evening classes. When Hannor got into the van, she observed Demetrius acting normally. When they arrived at the apartment, White stayed in the van with Demetrius. After dropping Hannor off at school, they returned to Walker's house. Demetrius ate dinner and was laughing and acting playful afterwards.

At about 9:00 p.m., Blackmon and his three children, along with White and her three children, left to pick up Hannor at school. After they got Hannor, Blackmon dropped off White and her children. Blackmon, Hannor, and their three children returned home, where Hannor got the children ready for bed. Hannor fed Demetrius a bottle at approximately 11:00 p.m. and put him down to sleep. Nothing about Demetrius's demeanor caused Hannor concern; he had been awake and made eye contact with her.

Hannor came to the living room, where Blackmon was located, and fell asleep watching a movie. She remained asleep until Blackmon woke her up and told her that Demetrius was not breathing. Demetrius had previously experienced instances of

difficulty breathing, including an event several days prior. Upon observing Demetrius struggling to breathe and staring blankly Hannor "wondered if something else was going on" and called 911. The 911 call was received at 12:15 a.m. on July 27, 2005.

Blackmon testified at trial that he fell asleep in the living room with Hannor, but that he woke up 20 or 30 minutes later. He checked on the children and saw Demetrius having trouble breathing. Blackmon picked up Demetrius, tried to console him, and tried to blow some air into his mouth. But Demetrius was limp and "didn't look right," so Blackmon woke Hannor.

After Hannor called 911, Demetrius was transported to a hospital. He was brain dead and no treatment or possibility for recovery existed. Demetrius was taken off life support on August 3, 2005.

## II.    Medical Testimony Presented At Trial

Dr. William Brooks was referred by the Department of Children and Families to determine whether child abuse was involved in this case. He testified for the State as an expert in the field of pediatrics as related to suspected child abuse cases. Dr. Brooks, who first observed Demetrius on August 1, 2005, testified that Demetrius suffered severe brain injuries and opined that the injuries were intentionally inflicted. Although Dr. Brooks could not pinpoint exactly when the injuries occurred, he opined that Demetrius likely received the injuries a short time before entering the hospital. Dr. Brooks believed that if Demetrius was acting normally at around 11:00 p.m., Demetrius likely did not receive the injuries prior to that time.

On cross-examination, Dr. Brooks testified concerning a report prepared by Dr. Nancy Rogers-Neame, a neurologist, which concluded that Demetrius's injuries could

have occurred from six to 24 hours prior to his admission to the hospital.[2] When asked about Dr. Rogers-Neame's report, Dr. Brooks stated that he did not disagree with the range she provided and that it was possible Demetrius could have been injured within six hours prior to admission to the hospital. But Dr. Brooks thought it was unlikely the injuries were suffered up to 24 hours prior to admission to the hospital. Dr. Brooks further conceded that based on this type of injury, a child would not necessarily be rendered unconscious immediately. Dr. Brooks acknowledged that the head injuries were not detected the first time the CAT scan and MRI were examined.

Dr. Leszek Chrostowski, the associate medical examiner who conducted Demetrius's autopsy, testified for the prosecution as an expert in the field of forensic pathology. Dr. Chrostowski opined that Demetrius died due to cranial cerebral trauma and that the manner of death was homicide. Dr. Chrostowski observed multiple impact points where Demetrius suffered traumatic injury, and opined that the injuries were consistent with blunt force trauma. Dr. Chrostowski testified that the injuries were not consistent with normal activity. He believed that a child under the age of one year who suffered such injuries likely would have been rendered unconscious almost immediately. However, Dr. Chrostowski did not disagree with Dr. Rogers-Neame's conclusion that the injuries could have been sustained between six and 24 hours prior to hospitalization.

Dr. Mariano Fiallos, a prosecution witness, was a pediatric hospital and intensive care physician who first saw Demetrius on July 27, 2005. Dr. Fiallos testified consistently with Dr. Brooks that the brain injuries were not observed during the first review of the CAT scan and MRI. However, Dr. Fiallos explained, another radiologist looked at the scans

---

[2] Dr. Rogers-Neame did not testify at trial.

and observed subdural bleeding, hemorrhages in the brain, and retinal hemorrhages and detachment. Dr. Fiallos testified that the circumstances were "highly suspicious of nonaccidental injury." Dr. Fiallos agreed with Dr. Rogers-Neame's time range for when the injuries might have occurred. Dr. Fiallos further testified that it was possible the injuries could have occurred in the afternoon but that Demetrius did not begin to exhibit signs or symptoms until much later. He clarified, however, that it was also possible the injuries occurred much closer in time to Demetrius's admission to the hospital.

Blackmon called Dr. Ronald Uscinski, who testified as an expert in the area of neurosurgery. Dr. Uscinski found no "hard evidence" of any direct trauma to the brain. He testified that the injuries could be consistent with blunt trauma to the head, but that it was not necessarily a major trauma. Dr. Uscinski opined that the injuries were consistent with trauma that can be accidental, and that injuries of this nature may appear insignificant at first but become more serious over time and manifest hours later in a dramatic way. He explained that even a seemingly trivial injury to the head can later lead to seizure activity, which in turn may cause a person to stop breathing and suffer oxygen deprivation in the brain. Dr. Uscinski testified that the scans showed Demetrius's brain had been deprived of oxygen. When asked about Dr. Rogers-Neame's report, Dr. Uscinski opined that her 24-hour timeframe was consistent with the with injuries and, further, that he would extend that timeframe to 36 to 48 hours.

### III.    The Parties' Theories And Argument

The State theorized that Blackmon caused Demetrius's injuries at night, when Hannor was asleep in the living room and Blackmon had the opportunity to be alone with Demetrius. Blackmon theorized that the injuries occurred during the day when Demetrius

was with the other caregivers and children. Defense counsel asserted in her opening statement (Doc. 16-3 Ex. 3 Vol. 3 at 285-86, 293):

> This case boils down to an equation. Time of injury plus multiple caregivers equals this man is not guilty. Time of injury. [The prosecutor] has already told you about the range. The State's own doctors will tell that the injury could have occurred anywhere between six hours before the child was admitted to the hospital and as much as 24 hours before the child was admitted to the hospital, that is the range. Time of injury.
>
> The State has already told you that this child during the course of a 24-hour period had multiple caregivers. Three adult women who were also caring for six other children including this baby. Later on the mother. So this case is going to boil down to that[ ] equation. Time of injury, the range of injury, plus multiple caregivers means Mr. Blackmon is not guilty.
> . . .
>
> We know the symptoms. We don't know when the injury occurred. That's for you, the jury, to decide. Because if you know the when, then you may know the who. And with this many caregivers over this long a period of time, that's the question you have to decide in this case. This case boils down to that equation. Time of injury plus multiple caregivers means Mr. Blackmon is not guilty.

In closing argument, counsel highlighted the evidence that the injuries could have been suffered in the 24 to 36 hours prior to arrival at the hospital and that the injuries could have initially appeared minor. Counsel asserted that the injuries could have occurred during a "range [of time that] is so large it's impossible to tell at what point this could have occurred and who the child was with when it occurred. And the fact that it could have been an accidental injury, a minor injury that went unnoticed and then blossomed into something more serious." (Doc. 16-6 Ex. 3 Vol. 7 at 994) Counsel argued about the circumstances in the house (Doc. 16-6 Ex. 3 Vol. 7 at 991):

> [T]hat injury could have occurred while he was being cared for by his aunt and her two friends and playing with those eight children in that small living room. You know, he said well, his couldn't happen in regular child play.[3]

---

[3] It appears counsel was referring to Dr. Chrostowski's testimony that the injuries were not consistent with normal activity.

But you know what, the scene that they painted was a daycare center gone bad. You got eight kids in a small living room from ages ten to two bouncing around a baby who's crawling on the floor. One woman's sick and sleeping on the couch the other two were in and out. They don't know what happened to that baby. And it's entirely consistent with what the defense expert and other experts have said is that Dr. Fiallos, their expert, it could have been the type of injury that starts small; you wouldn't even notice it. That's why they missed it at the hospital.

Counsel argued that Blackmon had presented a reasonable hypothesis of innocence that the injuries were accidental (Doc. 16-6 Ex. 3 Vol. 7 at 1001):

A reasonable hypothesis of innocence is accident. The reasonable hypothesis of innocence is that because the time frame is so wide, we don't even know who or when or where it happened. We know it happened. We're not disputing that this baby got hurt. What we're disputing is how the injury occurred. We presented a reasonable hypothesis to how this injury could have occurred and that hypothesis is accident. That hypothesis is one of innocence. And the law is very clear that if we present a reasonable hypothesis of innocence, you must, not you may, you must find Mr. Blackmon not guilty.

## STANDARD OF REVIEW

### I.  AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the denial of postconviction relief without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the

unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

## II.      Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Blackmon must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Blackmon must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt."). "The question [on federal

habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## EXHAUSTION OF STATE REMEDIES

A federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in his petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

## DISCUSSION

I.      **Ground One**

        A.      **Introduction**

As addressed, counsel argued that a third party was responsible for accidentally inflicting Demetrius's injuries. Blackmon contends that trial counsel was ineffective in failing to develop a defense of excusable homicide based on the theory that Demetrius

was accidentally injured while Blackmon played and wrestled with him but that Blackmon did not realize the severity of Demetrius's injuries at the time. Blackmon claims that he "acknowledged being with the child during the time period alleged by the State, and wrestling with the child, but denied culpability in the child's death." (Doc. 4 at 5) Blackmon argues (Doc. 4 at 6):

> Petitioner contends trial counsel rendered ineffective assistance in her failure to develop and establish evidence supporting an excusable homicide defense, which was consistent with her opening and closing arguments at trial, as even acknowledged by the trial court. Counsel however failed to advance any argument that the child's death could have occurred as a result of Petitioner's play with the child, and that Petitioner may have not known that the child was injured; argument that would have supported excusable homicide defense. Counsel failed to elicit or establish any evidence supporting such theory, which was not only viable, but consistent with the facts of Petitioner's case.

> Had trial counsel advanced such argument, or established evidence that the child's death may have resulted from Petitioner's innocent wrestling and play with the child, and that Petitioner was unaware that the child was injured during such play, a reasonable probability exists the jury may have found the excusable homicide viable, and returned a verdict of not guilty on the first-degree murder charge. Counsel's failure to therefore establish such evidence denied Petitioner constitutionally effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

In the response, Respondent identifies Blackmon's claim. (Doc. 16 at 4-5) Respondent concedes that Blackmon presented the claim in his Rule 3.850 proceedings and that the claim is therefore exhausted for federal habeas review. (Doc. 16 at 5) However, the specific claim Blackmon raises in his federal habeas petition is distinguishable from the claim he raised in his Rule 3.850 motion. Blackmon's Rule 3.850 motion raised a generalized claim that counsel was ineffective in not developing an excusable homicide defense. But Blackmon did not specifically state in the Rule 3.850 motion, or during the evidentiary hearing on the motion, that counsel should have argued

Demetrius's injuries were accidentally sustained when Blackmon played and wrestled with Demetrius. (Doc. 16-8 Ex. 19 at 11-16, Doc. 16-8 Ex. 23 at 13-17)

Thus, the claim of ineffective assistance presented in Blackmon's federal habeas petition is unexhausted. *See Weeks v. Jones*, 26 F.3d 1030, 1044-46 (11th Cir. 1994) (rejecting petitioner's argument that "the general claim of ineffective assistance in state court preserves for federal review all alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court."); *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992) ("[A] habeas petitioner may not present instances of ineffective assistance of counsel in his federal petition that the state court has not evaluated previously.").

Nevertheless, the Court notes that in presenting his ineffective assistance claim in his federal habeas petition, Blackmon states that he exhausted the claim in state court. (Doc. 4 at 7) The Court therefore interprets Blackmon's overall claim that trial counsel was ineffective in failing to develop a defense of excusable homicide as raising the same claim that he raised in his Rule 3.850 motion and will review that claim under AEDPA's deferential standard. In considering Blackmon's new, unexhausted claim, however, the Court must accept Respondent's concession as a waiver of the exhaustion requirement. *See* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). Given Respondent's waiver of the exhaustion requirement, Blackmon's unexhausted claim is subject to *de novo* review. *Cf. Davis v. Sec'y, Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003) (*de novo* review is

appropriate when the state courts fail to resolve the merits of a federal habeas petitioner's claim that was presented to the state courts).

### B. Exhausted Ineffective Assistance Claim

Blackmon alleged in his Rule 3.850 motion that counsel was ineffective in "fail[ing] to develop and build a defensive theory upon <u>excusable homicide</u>." (Doc. 16-8 Ex. 19 at 11) (emphasis in original)[4] In support, he claimed that his attorneys knew that the identity of the person responsible for Demetrius's death was at issue; that undisputed evidence established multiple caregivers watched Demetrius during the 24-hour window when his injuries could have been sustained; and that Blackmon's "theory of innocence" was that the injuries were accidental or were caused by another person. (Doc. 16-8 Ex. 19 at 13) The state court denied Blackmon's claim after an evidentiary hearing (Doc. 16-8 Ex. 24 at 3-6) (court's record citations omitted):

> In claim two, Defendant alleges that trial counsel was ineffective for failing to develop and build a defensive theory upon excusable homicide. Specifically, Defendant alleges that his attorneys were aware that one of the theories of defense was that the injury was the result of an accident. Defendant further alleges that counsel knew that identity, timing, and the fact that there were multiple caregivers for the child were issues in his case and supported Defendant's theory of innocence. Defendant cites to the trial transcript to show that counsel did not want an excusable homicide instruction given. It is Defendant's contention that the failure of trial counsel severely prejudiced the outcome of his trial and appellate proceedings.
>
> After reviewing the allegations, the court file, the testimony, and the record, the Court finds that Defendant has failed to demonstrate deficient

---

[4] The instruction on excusable homicide read to Blackmon's jury provided (Doc. 16-6 Ex. 3 Vol. 7 at 1025-26):

> The killing of a human being is excusable and therefore lawful under any one of the following three circumstances: One, when the killing is committed by accident and misfortune and in doing any lawful act by lawful means with usual, ordinary caution and without any unlawful intent; or, two, when the killing occurs by accident and misfortune in the heat of passion upon any sudden and sufficient provocation; or, three, when the killing is committed by accident and misfortune resulting from a sudden combat if a dangerous weapon is not used and the killing is not done in a cruel or unusual manner.

performance. To gain post-conviction relief based on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that this deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

At the evidentiary hearing, Defendant's trial counsel . . . first testified that the instruction for excusable homicide was ultimately given at trial. [Counsel] further testified that "if you look at [the] opening statement, from the opening statement, [the] theory was time and timeframe for the injury, multiple caregivers, [which would] mean [Defendant was] not guilty." [Counsel] went on to testify that she elicited from the State's experts that the time frame could have been anywhere from four to twenty-four hours and that the child was with eight other children and cared for by three other adults while Defendant was playing video games. [Counsel] testified that she also called a defense expert who expanded the timeframe and testified that the injury was of the type that could appear to be insignificant at first, but over the course of time progress into something that would be life-threatening.

[Counsel] also testified regarding the testimony Defendant gave at trial, in which he stated that he was not "blaming anyone" and was not "pointing the finger at anyone." [Counsel] testified that "nonetheless, that was still the heart of [her] defense and [she] made the argument in JOA, because [she] asked for a circumstantial evidence instruction and mere presence instruction." Additionally, [counsel] testified that she talked to Defendant "constantly" about this theory, so she was surprised during cross-examination when Defendant said he was not pointing the finger at anyone.

On cross-examination, [counsel] testified that there was no evidence to show that Defendant was the "actor" in any of the three situations that are covered by the excusable homicide instruction. [Counsel] testified that was why her theory was to argue that "it would have been a third party [and] that's why [counsel] developed the fact that the child was playing with other children, at least eight other children all day, in a small room."

Defendant testified that counsel did inform him of the theory of defense, but he "never really paid attention" and did not understand how it related to the accidental portion of the theory.

After reviewing the allegations, the court file, the testimony, and the record, the Court finds trial counsel['s] testimony to be more credible than that of Defendant. Here, the record demonstrates that [counsel] reviewed the theory of defense with Defendant "constantly." This is supported by [counsel's] testimony that she was surprised when Defendant testified at trial that he was not pointing the finger at anyone, since they had discussed that the theory was based on a third party being at fault. Further, the record

reflects that the instruction for excusable homicide was given at Defendant's trial.

The Court finds Defendant has failed to establish that his trial counsel's performance was ineffective. Moreover, the Court finds that trial counsel employed reasonable trial strategy in electing to argue that a third party was responsible for the injury to the child and that this theory was thoroughly discussed with Defendant.

As previously discussed, there is a strong presumption that trial counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 690. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. State of LA*, 350 U.S. 91, 101 (1955)). Further, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So.2d 1037, 1048 (Fla. 2000). As such, it cannot be said that [counsel] performed below an objective standard of reasonableness or that trial counsel's performance was unreasonable under professional norms. Therefore, no relief is warranted.

Blackmon has not shown that the state court unreasonably denied his claim. The state court's findings that counsel's testimony was more credible than that of Blackmon and that counsel made a strategic decision in choosing which defense to present are findings of fact. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) (stating that a state court's credibility finding is a factual finding); *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (stating that a question "regarding whether an attorney's decision is 'strategic' or 'tactical' is a question of fact[.]"). These findings of fact are presumed correct, and Blackmon must present clear and convincing evidence in order to rebut the presumption. *See* 28 U.S.C. § 2254(e)(1) (providing that in a § 2254 proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Blackmon has not presented clear and convincing evidence to rebut the presumption of correctness afforded to the state court's factual findings. Nor does Blackmon show that counsel's strategic decision was unreasonable. An attorney's strategic choice will only constitute ineffective assistance if it was patently unreasonable. *See Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (stating that a strategic choice "will he held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983))).

At the evidentiary hearing, counsel explained the development and presentation of the defense. The state court's order accurately reflects counsel's evidentiary hearing testimony concerning the evidence she adduced at trial, the defense she presented, and her discussion of the defense with Blackmon. The testimony that the state court found credible indicates counsel chose to argue that Demetrius's injuries were accidentally caused by a third party in light of evidence that other adults and children were around Demetrius during the day; that the injuries could have been inflicted during the course of the day but may have at first appeared insignificant; and that there was no evidence that Blackmon, who spent much of the time upstairs playing video games, was the actor who caused the injuries. (Doc. 16-8 Ex. 23 at 6-10) Under these circumstances, Blackmon fails to show that counsel's choice in presenting the defense that a third party caused Demetrius's injuries was so patently unreasonable as to constitute ineffective assistance. Additionally, the presentation of an excusable homicide defense would have significantly conflicted with the principal defense theory, strategically chosen by counsel, that the

injuries were most likely caused by a third party who had more significant physical interaction with Demetrius during the day.

Blackmon has not established that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief.

### C.    Unexhausted Ineffective Assistance Claim

Blackmon argues that counsel was ineffective in not presenting the defense that Demetrius's injuries were caused when Blackmon played and wrestled with Demetrius but that Blackmon did not realize the severity of the injuries at the time. Blackmon contends that he told counsel that "he played with Demetrius" but did not intend to kill Demetrius. (Doc. 17 at 5) This claim is afforded *de novo* review.

Blackmon is not entitled to relief because he has not established either prong of *Strickland.* "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Richter*, 562 U.S. at 105. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994), further explains the high standard facing a petitioner who alleges ineffective assistance:

> When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate." *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992). And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy." *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993).
>
> Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done

so. This burden, which is petitioner's to bear, is and is supposed to be a heavy one. And, "[w]e are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial . . . worked adequately." *See White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992).

Blackmon fails to show that his trial counsel performed deficiently in not presenting the defense Blackmon now proposes. Blackmon's vague and conclusory argument lacks supporting factual allegations. He does not describe when or in what manner he played and wrestled with Demetris. Nor does Blackmon assert how Demetrius sustained his injuries. Blackmon's own expert witness, Dr. Uscinski, testified that Demetrius's head was impacted in at least one place and possibly in multiple places. (Doc. 16-5 Ex. 3 Vol. 6 at 805-06) Blackmon's claim lacks any factual allegations explaining how an impact to Demetrius's head—even an accidental impact—occurred during the alleged playing and wrestling. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (stating that a federal court cannot grant habeas relief "on the basis of little more than speculation with slight support."); *Tejada v.* Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (a petitioner's vague and conclusory statements, unsupported by specific facts, cannot sustain an ineffective assistance claim).

Further, the record does not corroborate Blackmon's theory. Blackmon characterizes the relevant period as the time when Demetrius was in the room with other children. (Doc. 4 at 5) However, multiple witnesses testified consistently with one another that Blackmon spent little time interacting with Demetrius during the day. Chantrell Walker testified that Blackmon played video games in an upstairs bedroom. (Doc. 16-3 Ex. 3 Vol. 3 at 307) Walker stated that Demetrius was never upstairs with Blackmon, that Blackmon did not take care of Demetrius, and that she did not believe Blackmon was alone with Demetrius at her house. (Doc. 16-3 Ex. 3 Vol. 3 at 322, 324, 327) Teramesha Brown

testified that she never saw Blackmon interact with Demetrius, that Blackmon was not watching Demetrius, and that Blackmon stayed upstairs playing video games most of the time. (Doc. 16-3 Ex. 3 Vol. 3 at 440-42) Connetia White similarly testified that Blackmon spent most of the time upstairs playing video games. (Doc. 16-4 Ex. 3 Vol. 4 at 455, 477) Contrary to Blackmon's assertion in his federal habeas petition, these witnesses did not testify that they saw Blackmon playing with Demetrius.

Furthermore, Blackmon's own trial testimony offers no support for his new theory. Blackmon testified that he played video games upstairs and that, as far as he was concerned, the other adults were taking care of his children downstairs. (Doc. 16-5 Ex. 3 Vol. 6 at 868-711) Although Blackmon stated that he went downstairs to "eat and play and talk with everybody," he agreed that he spent most of the time upstairs. (Doc. 16-5 Ex. 3 Vol. 6 at 876-77, 902) Blackmon specifically mentioned playing with Demetrius only when addressing Connetia White's testimony that she saw him holding a belt and standing over Demetrius. Blackmon initially testified (Doc. 16-5 Ex. 3 Vol. 6 at 877-78):

Q. Okay. You heard Ms. Walden[5] testify yesterday about you holding a child's belt over the baby. Do you remember that?

A. Yes, ma'am.

Q. Okay. Tell me about that.

A. Well I came - -

Q. Were you spanking the baby?

A. No, ma'am.

Q. Tell me what was happening.

A. Okay. When I came downstairs, I went to play with the baby. I had the belt over like him [sic] I was going it [sic] spank him.

---

[5] Connetia White had also used the last name Walden. (Doc. 16-4 Ex. 3 Vol. 4 at 474)

Q. Was this an adult belt or - -

A. No, it was a little children's belt.

Q. Did the baby cry?

A. No, ma'am.

Q. Okay. Did you touch the baby with it?

A. No, ma'am.

Q. Okay. So you - - you were playing with the baby?

A. Yes, ma'am.

Q. Okay. So at any time before that or after that, did the baby cry?

A. No, ma'am.

Q. Okay. Now, Ms. Walden said she actually kicked you?

A. Um-hmm.

Q. Did that make you angry?

A. No she was playing.

Q. Okay. So you didn't get upset?

A. No.

Later in his testimony, Blackmon testified that he did things like "playing" with

Demetrius with the belt and making comments that Demetrius did not like him in order to

aggravate Chantrell Walker and Connetia White (Doc. 16-5 Ex. 3 Vol. 6 at 882-83):

Q. Okay. So what did you mean by that [the comment to the effect of the baby did not like him and he did not like the baby]? Did you mean you didn't like your baby?

A. I said things that I know they'll get mad at me. Like when I was playing with the baby with a belt, I know it's going to aggravate my sister and them playing with him like that.

Q. Okay.

A. You know. So I did stuff like to aggravate them because I know they're going to say something to me.

Q. So you were doing this in jest to aggravate them?

A. Yes, playing. Not to - - the baby has nothing to do with it. I'm playing, but it's messing with them because they going to mess with me. You know what I'm saying? Because I'm messing with the baby, I know they're going to mess with me. It's playing. That's it.

On cross-examination, Blackmon maintained that he was playing with Demetrius when he held the belt over the baby (Doc. 16-5 Ex. 3 Vol. 6 at 907-08):

Q. Now, I want to talk about the incident with the belt. Okay? Specifically, you agree that Ms. - - Ms. Walden White saw you with the belt; and you - - it looked as if you were going to strike the baby with the belt, correct?

A. Striking to hurt my child? Or which way did you put it?

Q. Well, it like you ready [sic] to hit the child. It looked like you were going to hit the child with the belt.

A. I was playing with the child.

Q. Okay. And you would agree, though, that it looked like you were going to hit the child with the belt?

A. I had a belt in my hand. I was playing with my child.

Q. And you had your hands in a manner and in a position?

A. Yes, sir. I had my hands up in a manner.

Q. As if you were going to strike the child with the belt?

A. But I wasn't fixing to strike my child.

Q. Okay. And you mentioned that when she kicked you, you didn't get upset, correct?

A. (Witness shakes head.) No, sir.

Q. Okay. But she got upset, correct?

A. Yeah.

Q. And she explained to you why she was upset?

A. Yeah. But her upset - -

Q. Like she testified yesterday?

A. Excuse me. Her upsetness wasn't like she was going to call the police, take me outside and beat me. She was like, you know, and you know, upsetness where you have a dog-out fight. It wasn't - - I don't want it to get taken out of context because it wasn't - - at that time, it wasn't like that.

Q. You don't want me to misquote you, correct?

A. However you want to put it. I just don't want it to be taken out of context because we was both playing, you know. I played with them all my life. We played.

Q. And so you think she was playing with you, correct?

A. If you want to say I think, we can go with that, too. At that time, we was playing. All of us was playing.

No part of this testimony supports Blackmon's assertion that he could have accidentally caused Demetrius's injuries by wrestling and playing with Demetrius. Blackmon was only seen standing over Demetrius, and his testimony contained no explanation or suggestion of how Demetrius's injuries could have occurred. Blackmon's vague and conclusory claim that counsel should have presented an argument devoid of factual or record support is insufficient to establish deficient performance. *See Tejada*, 941 F.2d at 1559. In addition, Blackmon has not met his burden to show a reasonable probability of a different outcome had counsel argued a generalized theory, unsupported by any specific facts and inconsistent with significant portions of the evidence, that Blackmon accidentally inflicted the injuries while playing or wrestling with Demetrius.

Accordingly, Blackmon has not met his burden to establish deficient performance and resulting prejudice under *Strickland*. As Blackmon therefore fails to establish ineffective assistance of trial counsel, he is not entitled to relief on Ground One.

## II. Blackmon's Reply

In Blackmon's reply, he contends that his postconviction counsel was ineffective. Blackmon also raises new claims of ineffective assistance of trial counsel that he did not raise in his habeas petition. He claims that trial counsel was ineffective in misadvising him not to take a plea, misadvising him that he would not receive a life sentence, and failing to investigate "all the children or adults." (Doc. 17 at 2) Blackmon may not bring new claims in his reply. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.") (citation omitted); *see also Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (stating that a court will "not address arguments raised for the first time in a *pro se* litigant's reply brief.").

Further, a claim of ineffective assistance of postconviction counsel is not a cognizable claim for federal habeas relief because there is no federal constitutional right to postconviction counsel. *See Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1263 (11th Cir. 2014) (recognizing that "[l]ongstanding U.S. Supreme Court precedent holds that a habeas petitioner cannot assert a viable, freestanding claim for the denial of the effective assistance of state collateral counsel in post-conviction proceedings."); *Chavez v. Sec'y, Fla. Dep't of Corr.*, 742 F.3d 940, 944 (11th Cir. 2014) (stating that since there is no constitutional right to postconviction counsel, there is no viable, freestanding claim for the denial of effective assistance in postconviction proceedings).

Blackmon's ineffective assistance of trial counsel claims raised in the reply are unexhausted because Blackmon did not present them in his Rule 3.850 motion. (Doc. 16-8 Ex. 19) Blackmon would be time-barred from raising them in another Rule 3.850 motion. *See* Fla. R. Crim. P. 3.850(b). Accordingly, the claims are procedurally defaulted, and Blackmon makes no argument showing that an exception applies to excuse the default. *See Smith*, 256 F.3d at 1138. The claims in Blackmon's reply do not warrant federal habeas relief.

Accordingly, Blackmon's petition for the writ of habeas corpus (Doc. 4) is **DENIED**. The **CLERK** is directed to enter a judgment against Blackmon and to **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY
## AND
## LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

**IT IS FURTHER ORDERED** that Blackmon is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S. § 2253(c)(1). Rather, a court must first issue a certificate of appealability. Section 2253(c)(2) limits the issuing of a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Blackmon must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Because he fails to make this showing, Blackmon is not entitled to a certificate of appealability. Therefore, he is not entitled to appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to proceed *in forma pauperis* on appeal is **DENIED**. Blackmon must obtain permission from the circuit court to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on this 25th day of February, 2020.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE